UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAM TOCCO, individually, and
as the Trustee of THE SAM TOCCO
REVOCABLE TRUST dated July 11, 2001,

               Plaintiff/Counter-Defendant,      CASE NO. 05-70013

-vs-                              PAUL D. BORMAN
                                  UNITED STATES DISTRICT JUDGE

SAM ANTHONY TOCCO, and
KNOLLWOOD MEMORIAL PARK
CEMETERY ASSOCIATION,

               Defendants/Counter-Plaintiffs,

_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**BACKGROUND:**

On February 9, 2005, Sam Tocco ("Grandfather"), individually, and as the Trustee of

THE SAM TOCCO REVOCABLE TRUST (the "Trust") dated July 11, 2001 ("Plaintiffs") filed

their Second Amended Complaint against Sam Anthony Tocco ("Grandson") and Knollwood

Memorial Park Cemetery Association ("Defendants") asserting the following:

    (1) Breach of Contract;

    (2) Rescission[1];

_____

     [1]On July 13, 2005, the Court signed a stipulation and order dismissing Plaintiffs'
rescission claim.

1

(3) Fraud in the Inducement;

(4) Negligent Misrepresentation;

(5) Preliminary Injunction.

On April 4, 2005, Plaintiffs filed a Motion for Preliminary Injunction and Order for Immediate Show Cause Hearing. Defendants filed their Response on April 11, 2005. Plaintiffs' Motion requests that the Court enter a preliminary injunction as follows:

> (1) enjoin Grandson and Knollwood from transferring or otherwise encumbering any assets of Defendant Knollwood;
>
> (2) order Grandson and/or Knollwood to deposit into the existing escrow account and/or a separate escrow account with this Court, the amount of $1,700,000 which represents proceeds from the sale of certain assets of Knollwood intended as security of debt to Plaintiffs;
>
> (3) enjoin Grandson from transferring any assets held in his individual capacity which were gained as a result of the transfer or encumbrance of Knollwood assets or stock; and
>
> (4) order that a certain Escrow Agreement entered into between the parties dated September 10, 2004 be adjudged released in favor of Plaintiffs.[2]

(Plaintiffs' Motion, pg. 2). The hearing on Plaintiffs' Motion was initially held on May 9, 2005 and was continued on June 29, 2005. At both hearings, the parties presented evidence and the Court heard argument and witness testimony. The final oral argument relating to Plaintiffs' Motion was held on August 4, 2005. It is also noted that the parties stipulated to Plaintiffs' request for a temporary restraining order on June 6, 2005. Thus, the issue before the Court is whether this injunction should continue.

The instant case involves several sophisticated transactions, and the parties present

---

[2]This request is moot as the Escrow Agreement has been released in favor of Plaintiffs. On July 13, 2005, this escrow agreement was eliminated by stipulated order.

2

detailed arguments in support of their positions.  The transactions and the parties' arguments are set forth below.

In 1968, Grandfather purchased Knollwood Cemetery.  Grandfather had employed Grandson to work at the Cemetery.  In the fall of 2003, Grandfather and Grandson opted to have Grandfather sell Knollwood to Grandson.

Grandfather contends that the transaction, as explained by Grandson, had two primary components.  First, according to Grandfather, Grandson represented that he would purchase the shares owned by Grandfather and the Trust for $2,700,000.00 and the purchase price for the shares would be made partially with a down payment and the remainder pursuant to two interest-bearing promissory notes with balloon payments of principal in twelve years.  Second, Grandfather alleges that Grandson represented that Grandfather would receive a pass-through from Knollwood of an additional $1,700,000.00 which represented proceeds to be paid to Knollwood by Capital Parks Associates, L.L.C. ("CPA") in exchange for approximately one-half of the cemetary land sold by Knollwood to CPA.  Grandfather contends that $400,000 would be paid by CPA in the form of a deposit which would be paid to Grandfather by Knollwood at closing, and the remaining $1,300,000.00 would be paid by Knollwood to Grandfather as sums were received by Knollwood from CPA pursuant to a third promissory note with approximately $7,000 in monthly interest.  Thus, Grandfather contends that Grandson represented that he should expect to receive a total of $4,400,000.00, plus interest for the sale of Knollwood. (Grandfather's Aff. ¶5, Ex. C to Defendants' Supplemental Brief).

Grandson retained the law firm of Hyman Lippitt, P.C. ("law firm") to evidence the sale of Knollwood from Grandfather to Grandson.  The legal documents used to effectuate this

transaction include a Stock Purchase Agreement, Promissory Notes, Stock Redemption Agreement, Security Agreement, Stock Pledge Agreement, Mortgage, Escrow Agreement and Assignment of Stock Certificate (the "Closing Documents").

### a.    Grandfather's lack of legal representation

According to Defendants, Grandfather retained attorney, John Kaake to represent him in this transaction. John Kaake testified unequivocally that he did not represent Grandfather in this transaction. The Court credits this testimony. Kaake testified "[w]e had no attorney-client relationship. There was never billed any money for any work because it was just that one meeting." (Transcript, at 84). In fact, Kaake testified that Grandson initiated his only meeting with Grandfather in order for Kaake to convince Grandfather that the transaction made sense from a tax perspective. (*Id.* at 85). Kaake testified to this meeting as follows:

> A. It lasted approximately one hour, and there were documents that were prepared at the meeting, and I looked at some of the wording and the documents to make sure it had the correct wording from a tax standpoint, and I mentioned the fact that we would have [sic] pay a premium for the stock for it to pass IRS muster, and at the meeting I believe John Gonway mentioned something about me possibly representing the grandfather in the transaction, which I informed him that I couldn't do because I have clients in Wyoming. I was going to be gone for two weeks, and you couldn't practice law from a CPA firm. It's a violation of the ethics rules. I said the grandfather would have to get another attorney.
>
> Q. Did you go to the closing?
>
> A. No.

(Transcript at 84).

The Court also finds that the transaction's closing checklist supports Kaake's contention because Kaake's only delineated responsibility was to prepare a tax return. (Plaintiffs' Supplemental Brief, Ex. A).

4

Defendants in their supplemental brief point to various alleged inconsistencies in John Kaake's testimony. The Court, however, finds that Kaake was unequivocal in his assertions that he did not represent Grandfather regarding this transaction. Defendants also point out that Grandfather signed a conflict of interest waiver letter prepared by the law firm acknowledging that he was represented by John Kaake with regard to this transaction. (Defendants' Response, Ex. V). The Court finds that the conflict of interest waiver letter has little probative value based upon Kaake's testimony and other uncontradicted facts. Plaintiffs point out that if Grandfather had been represented by Kaake, a conflict waiver letter would not have been necessary. Further, the Court finds that the timing of the conflict waiver letter was inappropriate, given that the letter is dated October 7, 2003, the day of closing. (Defendants' Supplemental Ex. I). Notably, the conflict letter also refers to Grandson and Grandfather as "clients" of the law firm. (*Id.*). The Court also notes that on October 7, 2003, the same date of the conflict waiver letter, Grandson's attorney Julie Kosovec, wrote a letter to Grandfather's prior attorney who had instituted litigation against Knollwood, chastising him for contacting Grandfather, the 100% shareholder of her client, Knollwood. (Plaintiffs' Supplemental Brief, Ex. B). The letter provides:

> I am in receipt of a September 30, 2003 letter addressed to Mr. Sam Tocco [Grandfather]. As you are undoubtedly aware, I represent Knollwood Memorial Park Cemetery. Consequently, you are fully aware that it is improper for you to contact the sole shareholder of my client. The Michigan Rules of Professional Conduct expressly prohibit such conduct.
>
> In the future, please direct all further communications to me.

(*Id.*).

Defendants also point out that the law firm sent John Kaake correspondence relating to the transaction. In particular, Defendants point to an October 6, 2003 letter sent by the firm's

John Gonway to John Kaake which included the Closing Documents.  However, the Court finds that Kaake testified he was in Wyoming at that time.  (Transcript at 84).  The Court finds that there is no dispute that John Kaake was not present during the closing.  Joseph Pia, an attorney for the Hyman Lippitt, P.C. law firm, who was present at the October 3rd meeting with John Kaake testified that Kaake specifically stated that he was going to be out of town the week of the closing.  (Pia Dep. at 31). The Court finds there is no credible evidence that John Kaake represented Grandfather regarding this transaction. Defendants also submit correspondence sent by the law firm to John Kaake after the closing.  (Defendants' Supplemental Exs. 5-20). However, the Court finds that the record is devoid of any evidence demonstrating that Kaake represented Grandfather or participated in the transaction in any manner except for his advice relating to the self cancelling installment notes.

Attorney John Gonway was a member of the law firm, and handled most of the transaction.  Gonway testified that his only meeting with Kaake was on October 3, 2003 meeting, and he provided:

Q.  Did Mr. Kaake indicate at the meeting on October 3rd that he couldn't represent Mr. Tocco in this matter?

A.  No.

Q.  He never said that?

A.  No.

Q.  Did he say that he was going to be out of town and wouldn't be at the closing on October 3rd?

A.  I don't recall when he told me that.

Q.  Did Mr. Kaake see the closing documents before they were signed by Mr. Tocco?

A.  Yes, they were present at our meeting on October 3rd.

Q.  So the documents that you had on October 3rd weren't changed?

A.  There were some minor changes.  I can't remember the extent of them.

(Gonway Dep. At 22).  Notably, Plaintiffs contend that the documents as presented on October 3,
2003 and as signed at closing on October 7, 2003, had changed to the extent of $400,000 in favor
of Grandson.  Further, if Kaake did represent Grandfather as Defendants purport, the law firm
violated the Rules of Professional Conduct by presenting new documents directly to Grandfather
and changing others at closing without review by his counsel.  The American Bar Association's
Model Rule of Professional Conduct, as adopted by the Michigan Rules of Professional Conduct
(Rule 4.2) prohibit this type of contact with a person of whom the lawyer knows is represented
by counsel.

In sum, for purposes of Plaintiffs' Motion, the Court finds that the Grandfather was not
represented by counsel regarding this transaction.  The Closing Documents, as written, are
examined below.

**b.       The Transfer of Knollwood from Grandfather to Grandson**

The sale of Knollwood consisted of two transactions, a stock sale and a stock redemption.
The consideration for the purchase of the 10,185 shares of Knollwood stock was an aggregate
price of $1,100,000.00.  This part of the sale required a payment of $5,000 to be paid to the
Trust, and the remaining $1,095,000.00 to be paid was evidenced by a secured, non-negotiable
promissory note by Grandson to the Trust (the "Note").  (Plaintiff's Motion, Ex. C).  The Note
provides that the balance of $1,095,000.00 be paid to Grandfather Trustee, as interest-only
payments due on the first of each month of $9,284.69 and ending with the unpaid balance to be

7

made by a balloon payment on November 1, 2015.  (*Id.*).

The Note set forth that payments be made by Grandson contingent upon the Grandfather being alive on the date of any scheduled payment under the Note.  This Self-Canceling Installment Note provided that Grandson's obligation to pay the installment payments automatically cancels in the event of Grandfather's death.  Defendants contend that John Kaake, who is also a Certified Public Accountant, was aware of Grandfather's tax consequences arising out of the Stock Purchase Agreement, and this structure was useful in minimizing Gift and Estate tax consequences to Grandfather.

The Note is secured by a Security Agreement between Grandson and Grandfather.  (*Id.* Ex. F).  Pursuant to the Security Agreement, Grandson grants Grandfather, a security interest in the 10,185 shares of stock in Knollwood (the stock sold pursuant to the Note), including all proceeds payable or received with respect to the stock.  (*Id.*).  Grandfather's security interest is perfected as defined in the Security Agreement as executing a Stock Pledge Agreement and Escrow Agreement, both dated October 7, 2003.  (*Id.* Exs. G and H).  According to the Stock Pledge Agreement, Grandfather's security is Grandson's right, title and interest in the 10,185 shares of stock and the Escrow Agreement provided that Grandson agreed to deliver to Escrow Agent (Hyman Lippitt, P.C.) the stock certificates representing the 10,185 shares.  (*Id.* Ex. H).

The remainder of the shares (14,815 shares) were to be acquired by Grandson by virtue of a stock redemption transaction for the price of $1,600,000.00.  The payment to Grandfather was to be made by a down payment of $100,000.00 with the balance provided for in a non-negotiable promissory note given by Knollwood to Grandfather (the "Land Contract Note") in the amount of $1,500,000.00.  (*Id.* Ex. D).  Pursuant to the Land Contract Note, Knollwood

8

agreed to pay Grandfather the balance of $1,500,000.00, plus interest.  The Land Contract Note was payable by interest only until November 1, 2015 on which the entire balance became due. (*Id.*).  Payment by Knollwood on the Land Contract Note was secured by a Mortgage with Land Contract Rider and a "springing" security interest granted in the Security Agreement.  (*Id.* Ex. E, I).

At the closing on October 7, 2003, Grandson made two down payments to Grandfather in the total amount of $105,000.00.  (Defendants' Response, Ex. J).  The fully executed Closing Documents were placed into escrow pending the occurrence of two events: (1) the approval of the transfer of ownership of Knollwood Cemetery by the Michigan Cemetery Regulation Department; and (2) the closing of the Land Contract between Knollwood Cemetery to CPA (the "Land Contract Sale").

The parties agreed that when the two contingencies set forth above were satisfied, escrow would be automatically broken and funds distributed.  (*Id.* Ex. L).  On December 5, 2003, Knollwood closed on the Land Contract Sale with CPA, thus satisfying the second condition to breaking escrow on the Stock Sale between the parties.

According to Defendants, although the transfer of the license had not been approved, Grandfather requested that the escrow funds be released so that he could use them for a down payment on a new condominium he had recently purchased in Florida.  Defendants contend that Grandson, although he had no obligation to do so, agreed to release the $105,000.00 held in escrow, and gave Grandfather an additional $35,000.00 advance to assist with closing costs on his new condominium.

On December 29, 2003, the parties jointly executed an "Order to Disburse Escrow"

which provided for the release of the $105,000.00 escrow funds.  (*Id.* Ex. M).  It further provided

that all documents shall automatically be disbursed upon approval of the transfer of ownership

by the Michigan Cemetery Regulation Department and the execution and delivery of the

Certificate of Trust for Existence from the Sam Tocco Revocable Trust.  Lastly, the Order

provided that payment on the Promissory Notes shall commence 60 days after escrow was

disbursed.  (*Id.*).

On February 4, 2004, the Michigan Cemetery Regulation Department approved the

transfer of ownership from Grandfather to Grandson, thus satisfying both conditions to breaking

escrow.  Defendants contend that the only remaining action to be taken by Grandfather was to

execute documents transferring authority in Knollwood Cemetery's Trust Accounts to Grandson.

Pursuant to statute, Michigan cemeteries maintaining the burial sites are required to maintain

Trust Accounts for the benefit of the deceased individuals placed at the cemetery.  These funds

are regulated by the Michigan Cemetery Regulation Department.  Grandfather refused to execute

the transferring documents.  Defendants filed an action in Oakland County Circuit Court seeking

a preliminary injunction regarding this breach.  The Oakland County Circuit Court ordered that

Grandfather execute the documents.  (*Id.* Ex. P).

The Michigan Cemetery Regulation Department agreed to transfer the license upon

evidence that Grandson had instituted a lawsuit against Grandfather.  On May 25, 2004, the

license was issued to Grandson to operate Knollwood.  (*Id.* Ex. Q).  Defendants provide that the

escrow conditions had now been met, pursuant to the Order to Disburse Escrow dated December

29, 2003, payments under the Promissory Notes were to commence sixty days after May 26,

2004.  (*Id.* Ex. M).  Around June 25, 2004 CPA paid off the Land Contract in full and

10

Grandfather's Land Contract Mortgage was discharged.  Defendants contend that Grandfather was not entitled to any of the proceeds of the Land Contract because Defendants were not in breach of the Promissory Notes.  Defendants contend that because escrow was not disbursed until May 25, 2004, payments had not begun and were not due until July 25, 2004.

A new escrow agreement was ultimately executed on September 10, 2004 based upon the Agreement that no breach could be declared until it was executed.  (*Id.* Ex. T).[3]

### c.        The Alleged Defaults and the Parties' Respective Contentions

The parties dispute the terms of Grandfather's security under the Land Contract Note referenced above.  The Mortgage executed on October 7, 2003 by Knollwood in favor of Grandfather secured Land Contract Note's payment with real estate which was the subject of the CPA Land Contract.  (*Id.* Ex. E).  The Mortgage contained a Land Contract Mortgage Rider which provided alternate security to Grandfather which conveyed the right, title and interest in the Land Contract between Knollwood and CPA with regard to the real estate at issue in this case.

Contemporaneous with executing the Mortgage and Land Contract Mortgage Rider, a Discharge of Mortgage and Land Contract Mortgage Rider was executed by Grandfather to be held in escrow as set forth in the Escrow Agreement.  (*Id.* Exs. I and H).  According to the Escrow Agreement, the Discharge of Mortgage and Land Contract Mortgage Rider was to be held in Escrow by the Escrow Agent (Hyman Lippitt, P.C.) and not delivered until the CPA Land Contract was paid off and/or the Land Contract Note was paid in full.  (*Id.* Ex. H).  Finally, the

---

[3]On July 13, 2005, this escrow agreement was eliminated by stipulated order.

Land Contract Note is secured by a springing security interest in the "collateral" which comes into existence in the event that the CPA Land Contract is paid in full prior to payment in full of the Land Contract Note. The "collateral" is defined as all proceeds received or payable with respect to the 10,185 shares of Knollwood stock. (*Id.* Ex. F, paragraph 1).

Plaintiffs contend that Knollwood received $400,000.00 as a down payment pursuant to its Land Contract with CPA, and that the entire balance has since been paid. Plaintiffs contend that they were entitled to receive any proceeds which were received by Knollwood pursuant to the CPA Land Contract. Plaintiffs contend that pursuant to the Land Contract Mortgage Rider, Grandfather was to receive payments as they were made by CPA pursuant to the CPA Land Contract. Plaintiffs contend that these payments were not made due to Grandson's not notifying CPA of Grandfather's interests and right to receive payments under the Land Contract. Plaintiffs state that the Land Contract Mortgage Rider discharged Grandfather's security once he was paid on his Land Contract Note via the CPA Land Contract payments. Therefore, Plaintiffs contend that the CPA Land Contract money should have been paid to Grandfather. Consequently, Plaintiffs state that Grandfather is unpaid pursuant to the Land Contract Note and additionally unsecured.

Defendants contend that the Mortgage and Land Contract provide security to Grandfather, but he would only be entitled to proceeds of any real estate sale, including the Land Contract with CPA, if there was a breach of the Notes. Defendants contend that they were not in breach of the Notes when the CPA Land Contract was paid off in June 2004, therefore, Grandfather was not entitled to any proceeds. Defendants contend that Plaintiffs' argument is directly contrary to the plain language of the Closing Documents. This issue will be discussed in

12

detail *infra.*

Plaintiffs also contend that Defendants have committed significant defaults and/or breaches as to their obligations under the Closing Documents. Plaintiffs contend that Defendants have failed to make payments under the terms of the Note and Land Contract Note. As a result of these defaults, Plaintiffs state that a lawsuit was filed in the State of Florida, which was remanded to Federal Court and ultimately transferred to this Court. With litigation pending, a new Escrow Agreement was executed on September 10, 2004 between Grandfather, Grandfather on behalf of the Trust, Grandson on behalf of Knollwood. (*Id.* Ex. K). Under this Agreement, payments under the Note and Land Contract Note were scheduled to commence on July 25, 2004. The new Escrow Agreement required that Grandson and Knollwood deposit all funds and future payments into the escrow account during the pendency of this litigation. As noted, on July 13, 2005, this escrow agreement was eliminated by stipulated order.

Grandson contends that he made payments on the express condition that he was not waiving any defense that the payments were not due and owing. Grandson provides that while a few checks were returned for insufficient funds due to clerical errors, he has made all payments into the escrow account and is not deficient in any manner.

**ANALYSIS:**

**A. Standard for a Preliminary Injunction/Temporary Restraining Order**

The Court must consider four factors in deciding whether to issue a temporary restraining order or a preliminary injunction: (1) whether the plaintiff has a strong likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable harm absent the injunction; (3) whether issuance of the injunction will cause substantial harm to others; and (4) whether the

13

public interest will be furthered by the issuance of the injunction. *Midwest Guaranty Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 907 (E.D. Mich. 2003). Whether to grant an injunction rests within the sound discretion of the Court. *Merrill Lynch v. Ran,* 67 F.Supp. 2d 764, 772 (E.D. Mich. 1999).

**B.  Discussion**

The four factor test set forth by the Sixth Circuit to decide whether to issue a temporary restraining order or a preliminary injunction is examined below.

**a.  Likelihood of Success on the Merits**

**1.      Alleged Default Regarding the Land Contract Note Secured by the Mortgage and Land Contract Mortgage Rider**

Plaintiffs contend that Knollwood has defaulted regarding the Land Contract Note secured by the Mortgage and the Land Contract Mortgage Rider. Plaintiffs contend that they were entitled to receive any proceeds which were received by Knollwood pursuant to the CPA Land Contract. Plaintiffs contend that Knollwood received $400,000.00 as a down payment pursuant to its Land Contract with CPA, and that the entire balance has since been paid. As such, Plaintiffs contend that this money should have been paid to Grandfather. As a result, Plaintiffs state Grandfather is unpaid pursuant to the Land Contract Note and additionally unsecured.

Defendants provide a different version of the facts. Defendants contend that Knollwood, in essence, assigned its interest in its Land Contract with CPA as security in the event of default. The Land Contract Mortgage provides that the Land Contract Mortgage secures Grandson's monthly payment under the Land Contract Promissory Note, and that Grandfather's mortgage

14

interest is inapplicable to CPA as the Land Contract Vendee, and that Grandfather may not claim

that there is a default in the mortgage upon the payoff of the Land Contract between CPA and

Knollwood.  The Land Contract Mortgage provides:

> Except for the interest of Capital Parks Associates, L.L.C. as reflected in the Land
> Contract and the Land Contract Mortgage Rider, Mortgagor agrees that if the Property or
> any part thereof or any interest in the Property, either legal or equitable, is assigned, sold,
> transferred, conveyed or further encumbered ... Lender [Plaintiffs] may require
> immediate payment in full.

(*Id.* Ex. E, ¶11).  As set forth above, the Court finds that the Land Contract Mortgage creates an

exception to Grandfather's mortgage interest for CPA's interest in the Land Contract.

Defendants provide that the Land Contract Rider was added to specifically address the

Land Contract between CPA and Knollwood.  The Land Contract Rider provides "[t]he

Mortgagee hereby agrees that if any Land Contract Vendee prepays or pays in full the balance

owing it under the Land Contract, Mortgagee shall discharge the Mortgage." (*Id.*).  The Land

Contract Rider  provides that it amends and supplements the Land Contract Mortgage.  (*Id.*).

The Court finds that the Land Contract Rider is only a mortgage and security interest not

a fee simple conveyance.  In other words, the right to receive payments is only triggered upon

default.  Defendants provide that the Stock Purchase Agreement and Promissory Notes set forth

Grandson's payment obligations to Grandfather and are devoid of any requirement that

Grandfather receive additional payments if the Land Contract is paid off.  Further, Defendants

state that Grandfather signed a Discharge of Mortgage with Land Contract Mortgage Rider at the

time of closing, and that the documents reflect the possibility that the Land Contract would be

paid off early, and the Discharge was held in escrow by the title company handling the

transaction between Knollwood and CPA.  (*Id.* Ex. F, G).  The Court finds that the Land

Contract Mortgage and Land Contract Mortgage Rider contemplate the CPA Land Contract being paid off without the proceeds going to Grandfather because they are security interests which are triggered only upon default.  The Court finds that the documents by their terms reflect this arrangement.

Additionally, the Security Agreement contemplates the Land Contract between CPA and Knollwood being paid off with no payment to Grandfather.  The Security Agreement sets forth the following:

> A.  Contemporaneous herewith, Debtor has executed and delivered to Lender a Non-Negotiable Promissory Note (the "Note") in the principal amount of One Million Ninety-Five Thousand and 00/100 ($1,095,000.00) Dollars;
>
> B.  Also contemporaneous herewith, Knollwood Memorial Park Cemetery Association ("Company"), a Michigan Corporation wholly owned by Debtor as of the date hereof, has executed and delivered to Lender a Non-Negotiable Promissory Note (the "Land Contract Promissory Note") in the principal amount of One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars; and
>
> C.  In order to secure the repayment of the Note (and the Land Contract Promissory Note in the event that the Land Contract between Company and Capital Park Associates, L.L.C. (the "Land Contract") is paid in full prior to payment in full of the Land Contract Promissory Note), Lender has required from Debtor, and Debtor is willing to grant to Lender, a security interest in certain Collateral (as hereafter defined) owned by Debtor.

(*Id.* Ex. H).  The Security Agreement further provides:

> Security Interest.  For value received, Debtor hereby grants to Lender a security interest in 10,185 shares of stock in Company (collectively, the "Property"), and all proceeds payable or received with respect to the Property (the "Collateral"), to secure the payment of the principal and interest on all obligations of Debtor under the Note, including any future advances thereunder (the "Indebtedness"), and the performance by Debtor of its obligations under this Agreement.  In addition, Debtor hereby grants to Lender a springing security interest in the Collateral that will only come into existence in the event that the Land Contract is paid in full prior to payment in full by Debtor of the Land Contract Promissory Note.

(*Id.*).

16

Further, Defendants state that as added security to Grandfather, a Stock Pledge Agreement was executed by Grandson in Knollwood where they pledged all right and title to the 10,815 shares of Knollwood to Grandfather.  (*Id.* Ex. I).  The Stock Pledge Agreement provides:

> [i]n order to secure the repayment of the Land Contract Promissory Note, Lender [Grandfather] has required from Pledgor [Grandson], and Pledgor is wiling [sic] to grant to Lender, a security interest in certain stock owned by Pledgor with such security interest only to spring into existence to secure the Land Contract Promissory Note after payment in full of that certain Land Contract made by and between Company, as Vendor, and Capital Park Associates, L.L.C., as Vendee.

(*Id.*).

An Escrow Agreement was also executed between the parties whereby Grandson deposited all his pledged stock into escrow in the event of default.  The Escrow Agreement also contemplates the necessity of "additional security" when the Land Contract between CPA and Knollwood was paid off in full prior to the Land Contract Promissory Note being fully satisfied. The October 7, 2003 Escrow Agreement provides:

> Pursuant to the Pledge Agreement, Assignor and Assignee have agreed to deliver the Collateral [the shares of stock] into escrow with Agent, to be held as security for the payment by the Assignor of the Note, the Land Contract Promissory Note (in the event that the Land Contract is paid in full prior to the payment of the Land Contract Promissory Note) and the Security Agreement.

(Plaintiff's Motion, Ex. H).

There are several issues for the Court to examine with respect to this issue.  First, the Court agrees with Defendants in that the Closing Documents contemplate the CPA Land Contract being paid off.  However, the Court disagrees with Defendants' attempt to paint a factual scenario where it would appear as though Grandfather is receiving "additional security" when the CPA Land Contract is paid off without the proceeds going to Grandfather.  In reality, the "additional security" referred to by Defendants is merely the security Grandfather already

17

possessed under the Note (i.e. the 10,185 shares of stock in Knollwood). Therefore, while Defendants may be correct in that they are not technically in default regarding the CPA Land Contract under the Closing Documents as written, there are several troubling aspects to this transaction.

The first question is the timing of the CPA Land Contract sale. Even accepting Defendants' version of the facts, the CPA Land Contract was paid off, and Defendants received the proceeds of the sale, before any payments were even due under the Land Contract Note. Second, as noted above, in reality, Grandfather did not receive additional security once the CPA Land Contract was paid off. Grandfather's "additional security" was the same interest he already possessed in the 10,185 shares of Knollwood. Therefore, by virtue of Defendants' actions, Grandfather was effectively stripped of his security under the Land Contract Note before the payments under it even became due.

The Court finds that this transaction as documented is extremely favorable to Grandson. Grandson is required to make interest only payments until 2015, and this requirement is cancelled upon Grandfather's death. This means that under the terms of the transaction, Grandson will likely receive a valuable existing business for very little consideration. Further, as noted above, Grandson's payment obligations set forth in the Land Contract Note pursuant to the stock redemption transaction that transferred the majority of Knollwood's stock, is essentially left unsecured because Grandfather has no additional security to protect his interests.

The Court finds that Defendants have not defaulted under the terms of the Closing Documents regarding the Land Contract Note secured by the Mortgage and Land Contract Rider. The Court, however, finds that the one sided nature of the Closing Documents, and the

18

surrounding circumstances, support Plaintiffs' fraud in the inducement claim discussed next.

### 2.    Plaintiffs' Fraudulent Inducement Claim

Plaintiffs argue that they will likely succeed on their Fraud in the Inducement claim. The Court agrees with Plaintiffs. Under Michigan law, fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may be reasonably expected to be relied upon and are relied upon. *Begola v. Wild Brothers,* 210 Mich. App. 636, 639 (Mich. App. 1995). Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party. *Id.* at 640.

Plaintiffs allege that Grandson represented that Grandfather should expect to receive a total of $4,400,000.00, plus interest for the sale of Knollwood. (Grandfather's Aff. ¶5, Ex. C to Defendants' Supplemental Brief). Plaintiffs contend that Grandson made these false representations to induce Grandfather to execute the Closing Documents, and Grandson, in reality paid very little consideration to Grandfather. Plaintiffs allege that Grandson knowingly took advantage of Grandfather whom he knew to be elderly and without legal representation, and Grandfather relied to his detriment on Grandson's misrepresentations.

Plaintiffs contend that Grandson utilized the trusting relationship he had with Grandfather to induce him to sign the Closing Documents. Plaintiffs provide:

> [a]dmittedly, these causes of action raise some questions of fact as to the misrepresentations and fraud utilized by Grandson to induce Grandfather into executing the transaction documents. However, one only need to look to the fact that an asset worth $4,000,000.00 plus changed hands between Grandfather Trustee and Grandson for very little cash and what has resulted to be promissory notes with essentially no security (until such time injunctive relief is granted).

(*Id.* at 15-16). The Court finds that the following support a strong likelihood of success regarding Plaintiffs' Fraud in the Inducement claim: (1) the extremely one-sided nature of the

Closing Documents; (2) Grandfather's lack of representation by counsel; (3), his family relationship with Grandson, and (4) his age and medical condition.

Plaintiffs submit medical records and affidavits from Grandfather's treating physicians which support the finding the Grandfather lacked the capacity to understand this complex transaction. The evidence indicates that Grandfather suffered from dizziness and vertigo and other ailments of his advanced age. Even without regard to Grandfather's medical condition, the Court finds that Grandfather, as would any untrained person in this field, lacked the capacity to understand this highly technical and complex transaction. Further, Grandfather sets forth that he trusted and relied upon his Grandson regarding the substance of the transaction. (*Id.* ¶8). Notably, Grandson was represented by counsel, Grandfather was not. Consideration of these facts taken with the extremely one-sided transaction in Grandson's favor, provide enough evidence for the Court to find a strong likelihood of success for Plaintiffs on their fraud in the inducement claim.

Joseph Pia's testimony further supports Grandfather's fraud in the inducement claim. Joseph Pia is an attorney at Hyman Lippitt, P.C. and attended the October 3, 2003 meeting at Kaake's office. Pia initially testified that it was explained to Grandfather at this meeting that if the Land Contract Note was not paid, Grandfather could foreclose on the real estate under the Land Contract, and that the Land Contract payments would remain in the corporation and be available cash to pay of the notes. (Pia Dep. at 37-39).[4] As noted, the documents do not reflect

---

[4]Pia did change his testimony later in the deposition under suspicious circumstances. Pia changed his testimony that the funds from the land contract were to remain in the corporation when examined by his attorney, Julie Kosovec, also a member of the Hyman Lippitt law firm. Pia admitted that Kosovec spoke to him about his testimony regarding the mortgage having to stay in the corporation during a restroom break. (*Id.* at 111-112). After this conversation, Pia

this arrangement and the Land Contract was paid off before payments under the Land Contract

Note even became due.  Thus, this is probative evidence relating to Grandfather's fraudulent

inducement claim because it shows what Grandson and his attorneys represented to him.

> Defendants point to the integration clause contained in the Stock Purchase Agreement:
>
> <u>Entire Agreement and Construction.</u>  This Agreement, together with the Exhibits attached
> hereto, constitutes the entire agreement between the parties pertaining to the subject
> matter hereof and supersedes all prior arrangements, understandings, negotiations and
> discussions, whether oral or written, of the parties.  No amendment, supplement,
> modification, waiver or termination of this Agreement shall be binding unless executed in
> writing by the party against whom the enforcement is sought.  No waiver of any of the
> provisions of this Agreement shall be deemed or shall constitute a waiver of any other
> provisions hereof (whether or not similar), nor shall such waiver constitute a continuing
> waiver unless otherwise provided...

(Defendants' Response, Ex. B, §6.2).

Defendants argue that in light of this integration clause, any evidence of a prior verbal

agreement which is inconsistent with the Stock Purchase Agreement will be inadmissible

pursuant to the parol evidence rule.

The Court finds that Plaintiffs' allegations of fraud in the inducement invalidate the

integration clause itself.  The Court acknowledges that Michigan courts hold that when an

explicit integration clause is included within a contract, evidence of a prior oral agreement is

inadmissible under the parol evidence rule.  The parol evidence rule provides that "parol

evidence of contract negotiations, or, of prior or contemporaneous agreements that contradict or

vary the written contract, is not admissible to vary the terms of a contract which is clear and

unambiguous."  *UAW-GM Human Resource Center v. KSL Recreation Corp.,* 228 Mich. App.

486, 492 (Mich. App. 1998).  However, as noted above, the integration clause and the parol

changed his testimony regarding the Land Contract Mortgage.

evidence rule apply when there are no allegations of fraud which would invalidate the contract or merger clause itself.  As the *UAW* Court provided:

> For these reasons, we hold that when the parties include an integration clause in their written contract, it is conclusive and parole evidence is not admissible to show that the agreement is not integrated *except in cases of fraud that invalidate the integration clause*...

*Id.* at 418. (Emphasis added).  Therefore, the Court finds that Defendants' reliance on *UAW* is misplaced because Michigan law recognizes an exception to an integration clause's conclusiveness in cases of fraud.  The Court notes that an integration clause is particularly ineffective in fraud in the inducement claims such as the instant one.  As one commentator provided:

> a merger clause will not preclude proof of fraud ... that consists of tricking the other party into signing a document thinking it is something other than it is (a contract rather than a will, for example), or of misreading the contents of the document to the signor, or of inducing the signor not to the read the contents of the document at all.

11 Williston on Contracts §33.21 (4th ed.).

Accordingly, the Court finds that the existence of an integration clause in the Stock Purchase Agreement does not preclude Plaintiffs' fraud in the inducement claim.  In sum, the Court finds that Plaintiffs have presented sufficient evidence to demonstrate a strong likelihood on the merits regarding their fraud in the inducement claim.

### 3.    Defendants' Alleged Defaults under the Note

Plaintiffs allege breach of contract against Defendants for Grandson's failure to make payments in compliance with the agreements as written. Defendants argue that Grandfather's breach of contract claim is barred because he committed the first material breach of the Stock Purchase Agreement.  Michigan law provides that the party who commits the first substantial

22

breach of a contract cannot maintain an action against the other contracting party for failure to perform. *Ehlinger v. Bodi Lake Lumber Co.,* 324 Mich. 77 (1949). The Michigan Supreme Court has defined a "substantial breach" as follows:

> where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the complete failure of consideration or the prevention of further performance by the other party.

*McCarty v. Mercury Metal Craft Co.,* 372 Mich. 567, 574 (1967).

Defendants contend that Grandfather breached the Stock Purchase Agreement by refusing to execute the Trust Fund Change of Control Authorization. Defendants filed an action in Oakland County Circuit Court seeking a preliminary injunction regarding this breach in which the Court ordered that Grandfather execute the documents. (Defendants' Response, Ex. P).

The Court finds that Grandfather's breach was not a substantial breach so as to bar Plaintiffs' breach of contract action under Michigan law. The Court finds that Grandson received the benefit of his bargain. The Court finds that Grandfather's breach was cured, and at the time Grandson defaulted on the Notes, Grandfather's breach had not effected such a change so as to render his performance ineffective or impossible.

Plaintiffs allege breach of contract against Defendants for Grandson's failure to make payments in compliance with the agreements as written. Plaintiffs contend that Grandson has failed to make timely payments, skipped payments, and provided checks which were returned for non-sufficient funds. (See Plaintiffs' Motion, Ex. L). Specifically, Plaintiffs point to Grandson's default on payment due under the Land Contract Note.

The Court finds that Grandson submitted a check in payment on the Land Contract Note which was returned for non-sufficient funds. As required under the Land Contract Note,

23

Grandson was placed on notice of the default.  Thereafter, Grandson submitted another check which was also returned for non-sufficient funds.  Plaintiffs have presented to the Court the returned checks and the default notice.  (*Id.* Exs. M, N).   Accordingly, Plaintiffs maintain they are entitled to damages, acceleration and foreclosure.

Grandson acknowledged these alleged defaults, Grandson testified:

Q.  Did you receive any notices of default from your grandfather or his Attorney?

A.  On this note?

Q.  Yes.

A.  I don't believe so, no.

Q.  Okay.  Did you receive any notices of default under the larger note?  The other note.

A.  Yes.

Q.  Okay.  And do you know why you received those notices?

A.  Because one of the checks did not go through due to a lack of time of transferring money.

(Grandson's Dep. at 66-67).  Grandson further testified in his deposition:

Q.  Okay.  Did you bounce any checks for any payments?

A.  There was, I believe, two checks.

(*Id.* at 66).

At oral argument, Defendants contended that because Grandfather did not present their check immediately, Grandfather has effectively lost his breach of contract claim based upon the second bounced check.  The first check issued to Grandfather bounced on November 1, 2004.  (Plaintiffs' Motion, Ex. L).  Grandfather sent a notice of default on November 2, 2004.  (*Id.*).  Grandson issued a second check to Grandfather dated November 5, 2004.  (*Id.*).  It is not entirely

24

clear from the record when Grandfather actually received Grandson's second check.  Grandson's

counsel sent Grandfather a letter which Grandfather received on November 8, 2004,

acknowledging the first bounced check and notifying Grandfather that Grandson will issue a new

check.  (Plaintiffs' Ex. B presented at the June 29, 2005 evidentiary hearing).  Grandson's

counsel alluded at the August 18, 2005 oral argument that Grandfather received the second

check on November 10, 2004.  Grandfather presented the check for payment on December 10,

2004, and at this time, the second check bounced.  (*Id.*).  Defendants presented to the Court a

bank account balance summary indicating that during the month of November, Grandson had

enough cash in his account to cover the check.  Defendants appear to argue that Grandfather's

delay in cashing the check was unreasonable, therefore his breach of contract claim fails.  The

Court rejects Defendants' argument.

As Plaintiffs noted, Defendants have presented no legal authority to this Court to support

their claim that Grandfather lost his breach of contract claim because he failed to cash

Grandson's check immediately.  There is no dispute that the second check was returned for

insufficient funds on December 10, 2004.  Thus, there is no dispute that Grandson failed to cure

his November 1, 2004 breach.  The Court notes that Grandfather attempted to cash Grandson's

check approximately 30 days after he received it, and this is not an unreasonable delay.  Article 3

of the Uniform Commercial Code provides that if a holder of a check presents that check for

payment within 30 days, this is presumed reasonable.  See U.C.C. §3-503(2)(a); see also MCL

§440.3503(2)(a).  In fact, the Sixth Circuit has held that a holder of a check beyond the U.C.C.'s

30-day reasonable presentment period did not discharge the liability of the drawer of the check,

where the drawee bank had not become insolvent during the delay.  See *Harik v. Harik,* 861 F.2d

139 (6th Cir. 1988).   The Court finds that Grandfather's delay in cashing the check was not

unreasonable and does not relieve Grandson's liability for his breach.

The Court finds that based upon the evidence before it, Plaintiffs have demonstrated a

strong likelihood of success on their breach of contract claim for Grandson's failure to make

timely payment under the Land Contract Note.

### b. Irreparable Harm to Plaintiff

Both parties contend that they will be substantially harmed by the issuance of an

injunction. Plaintiffs contend that their harm is irreparable because that security Grandfather had

for the Land Contract Note has been transferred to a third party.  Plaintiffs contend that the relief

requested will reinstate Grandfather to his status as a secured creditor.  The Defendants contend

that this Court should not continue the preliminary injunction preventing Defendants from

disposing of their assets because Plaintiffs primarily seek money damages.

Plaintiffs cite *Niedzialek v. Barbers Union,* 331 Mich. 296 (1951) to support their claim.

In *Niedzialek,* the plaintiffs sought to enjoin alleged unlawful picketing of their barber shop.  The

Court found that a temporary injunction enjoining the picketers was appropriate because if the

picketing continued in the interim (prior to a hearing on the merits) plaintiff would suffer

irreparable injury.  The Court held that:

> [i]n the instant case, it is quite self-evident that if the picketing instituted by defendant is
> not temporarily restrained plaintiff's business will be completely ruined or at least suffer
> irreparable damage pending final decision herein.  On the other hand it seems equally
> apparent that granting the temporary injunctive relief sought will not subject defendant to
> any material ultimate damage or deprivation of rights.  We are constrained to hold that in
> denying plaintiff's application for a temporary injunction the trial judge failed to properly
> exercise his discretion.

(*Id.* at 301).  The Court found that under these circumstances, a temporary injunction to preserve

26

the status quo was appropriate.  Similarly instantly, the Court finds a temporary restraining order to preserve the status quo appropriate.

Defendants cite the United States Supreme Court case *Sampson v. Murray,* 415 U.S. 61 (1974) which provides:

> The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

(*Id.* at 91).  Defendants make much of the fact that Plaintiffs are only seeking monetary damages. The Court, however,  finds otherwise due to the extraordinary facts of this case.  The Court finds that given the nature of Plaintiffs' claims and Grandson's subsequent actions, that there is a strong possibility that corrective relief will not be available to Plaintiffs in the ordinary course of litigation absent an injunction.[5]  Therefore, the Court finds *Sampson* distinguishable from the instant case.

Defendants presented the testimony of Bruce Knapp, CPA, CVA, at the evidentiary hearing.  Despite Knapp's testimony that Knollwood maintains sufficient security for Grandfather in the event of a default, the Court finds that Grandfather is inadequately protected. First and foremost, through alleged fraud, Grandfather has been effectively stripped of his security interest under the documents as written.

Further, the Court notes that the 35 acre land sale pursuant to the CPA Land Contract is central to Plaintiffs' fraud claim.  Knapp has testified that it made business sense to sell the 35

---

[5]The Court also notes that Plaintiffs seek foreclosure based upon their breach of contract claim.

27

acres, and this sale creates a sufficient income stream for Grandson to pay any debt obligation to Grandfather. (Transcript at 75). However, the Court finds that, without continuing the preliminary injunction, there is nothing preventing Grandson from transferring or concealing the assets which would provide security to Grandfather in Knollwood. Indeed, Grandson has already taken $1,000,000 from Knollwood and loaned it to his friend Joe Zada. (Transcript at 35-36). The Court notes that this loan is unsecured, and there is documentation representing only $600,000 of this loan, a $350,000 promissory note payable in full no later than December 2005, and a $250,000 promissory note payable no later than March 1, 2006. (Plaintiffs' Supplemental Brief and Submission of Recently Obtained Discovery, Exs. A-B). Joe Zada signed an unconditional guarantee to Grandson relating his indebtedness to Grandson. (*Id.* Ex. C). However, in consideration for Joe Zada's guarantee, Grandson agreed to *inter alia* to "any extension of time for payment of any indebtedness of Borrower [Zada] to Lender [Grandson]." (*Id.*). Thus, there is a distinct possibility that the notes issued to Joe Zada will not be paid on the dates set forth in the notes. Without an extension of the Preliminary Injunction, there is nothing to prevent Grandson from similar future transfers of Knollwood's assets which would jeopardize Grandfather's already scant security interests.[6]

---

[6]Plaintiffs have attached a bankruptcy petition of Early Bird Brokers, a closely held corporation founded by Grandson's father, Salvatore Tocco. (Plaintiffs' Supplemental Brief, Ex. C). Plaintiffs also attach a Downward Departure and Sentencing Memorandum relating to Grandson's father's conviction of "check kiting." (*Id.* Ex. D.). Plaintiffs contend that these exhibits are probative of poor managerial skills of Grandson. The Court, however, finds that this evidence has no probative value because there is no evidence of Grandson's participation in Early Bird Brokers's bankruptcy or his father's criminal conviction.

28

Accordingly, Plaintiffs have established the irreparable harm requirement.[7]

**c. Impact on Public Interest**

Plaintiffs provide that there is a strong public interest in protecting our elderly from being taken advantage of with respect to transaction such as the instant one.  On the other hand, Defendants contend that there is no evidence supporting that notion that Grandfather was "taken advantage of." Defendants further provide that the public interest would best be served by denying Plaintiffs' motion because a bedrock principle of American contract law is that parties are free to contract, and the courts are to enforce the agreement as written absent highly unusual circumstances.  Defendants further provide evidence by way of Grandson's affidavit stating that Grandfather is a healthy and robust individual and an experienced businessman.  (Defendants' Response, Ex. U).

The Court finds that there is significant evidence that Grandfather was defrauded or taken advantaged of regarding this transaction.  The Court also finds this transaction  particularly troublesome because of the evidence at this point demonstrates that an elderly grandfather was deceived by his grandson with assistance by his legal counsel, of effectively "giving away" his life savings.   The Court finds the public interest lies in continuing the preliminary injunction.

In summation, the Court continues the preliminary injunction as follows:

(1) Grandson and Knollwood are enjoined from transferring or otherwise encumbering any assets of Defendant Knollwood;

(2) Grandson and Knollwood are ordered to deposit into a separate escrow account with this Court, any payments received under the two Promissory Notes, dated March 25, 2005, (totaling $600,000), issued to Grandson and/or Knollwood by Joe P. Zada;

---

[7]The substantial harm to others requirement does not appear to be at issue in this case. The Court notes that the parties have not addressed it in their pleadings.

(3) Grandson is enjoined from transferring any assets held in his individual capacity which were gained as a result of the transfer or encumbrance of Knollwood assets or stock.

**SO ORDERED.**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 26, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 26, 2005.

s/Jonie Parker
Case Manager